UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

THOMAS KRANS,

        Plaintiff,

v.                                                               Case No. 07-C-803

TOWN OF AURORA, et al.,

        Defendants.

**DECISION AND ORDER**

        Plaintiff Thomas Krans, a property owner in the Town of Aurora, filed a lawsuit against the Town, two of its former elected officials, and a local citizen. In his amended complaint Krans alleges that the officials' actions unconstitutionally impaired a contract he had with a company called Residual Management, and he further alleges that the Defendants' actions violated the Equal Protection Clause. His principal claims, however, are based on state law: he alleges that the Defendants defamed him by suggesting that his proposal for filling his property with foundry sand would be dangerous to public health. In addition, the amended complaint alleges Defendant Wicklund spread libelous materials about Krans' development plan. The Defendants have moved for summary judgment and, for the reasons stated herein, their motion will be granted.

**I. Background**

        In August 2003, Krans submitted an application to the Florence County Planning and Zoning Committee for a conditional use permit for his property in the Town of Aurora. The purpose of the

application was to allow him to use foundry sand as fill for a large project on his property, the end result of which would be a parking lot and business development.

Foundry sand contains metal remnants left over from the casting process, and spent sand is often used in highway or fill applications.[1] Krans' plan described a need for approximately 96,000 cubic yards of foundry sand and called for a Phase I and Phase II, which were designated areas on Krans' property abutting the road where two county highways meet. (Wolosyn Aff., Ex. D at 000495). A third area was to be filled with "native" fill rather than foundry sand. (*Id.*, Ex. C and D.) On October 7, 2003, the Committee granted the conditional use permit over the concerns of some that the project might have an adverse environmental or health impact. (Wolosyn Aff., ¶ 11.) The conditional use permit allowed the project to proceed with foundry sand fill in the two phases described above.

The details regarding the next few years are hazy. At some point, however, Krans wanted to use foundry sand for a Phase III of the project, and he sought approval from the Aurora Town Board (not the county zoning committee) in order to do so. He appeared before the three-member board on August 28, 2006, and the meeting quickly broke down and became a name-calling contest and battle of personalities. (Dkt. #61, Ex. B (Krans Depo.) at Ex. 29.) Krans seemed to sense ahead of time that two members of the board (Defendants Newingham and Hedmark) were opposed to his project, but he believed it was imperative to at least have a vote on the matter before instituting a lawsuit. Krans began the meeting as follows:

---

[1] According to the EPA, "The overwhelming majority of this sand is non-hazardous and can be effectively reused in a variety of ways, including roadbeds, construction fill, and cement manufacture." *See* http://www.epa.gov/ispd/metalcasting/foundry.html.

> I'm requesting the approval of the use of foundry sand for beneficial use under chapter NR 538.10(10), confined geotechnical material. This is the final phase of the project. It was estimated at 96,000 cubic yards to complete this project. Under the previous board, there was a resolution not to permit any new foundry sand projects in the Town of Aurora but with the exclusion to let me complete this project in full . . . This project is two-thirds done, and this will complete the project in full. . . . This was approved under the old board when the project was started. . . . So I'm here showing you the drawings that are required to finalize this project. . . . And I'm looking to move forward with this project next week.

(*Id.* at 3-4.)

Krans and the board members began discussing the proper approach for approval of the project, and Krans indicated his belief that the town board was the first step in that process before obtaining the approval of the DNR and the Florence County Planning and Zoning Committee. After Defendant Newingham indicated his opposition to the project, an interchange of insults and threats of litigation ensued. (At one point an unidentified woman asked, "why are we all so negative? In every board . . . do they fight like this at every damn meeting there is?" (*Id.* at 22-23.)) Eventually, though Krans must have known it would be fruitless, he asked for a vote on his proposal. "But I'm still asking for . . . I mean, is it going to go up for any kind of a vote or anything?" (*Id.* at 27.) They took a vote, with the two Defendant board members opposing Krans and one supporting him.

Krans now alleges that these negative votes prevented him from continuing with his project. Although it is unclear whether the town board's approval was even a required step in the process, the heavily politicized nature of the job apparently scared off Residual Management, the hauler of the foundry sand with whom Krans had contracted to do the work. Thus, Krans also alleges that the Defendants' votes interfered with his contract with Residual Management.

3

**II. Analysis**

**A. Impairment of Contract**

Krans first argues that the actions of the Defendants unconstitutionally impaired contractual obligations, in violation of Section 10 of Article I of the Constitution. That section provides that "[n]o State shall . . . pass any. . .law impairing the Obligation of Contracts." U.S. Const. art. I, § 10. The Defendants rely on *Khan v. Gallitano* to support their argument that their vote against Krans' project did not violate the Contracts Clause. 180 F.3d 829, 832 (7th Cir. 1999). In *Khan*, an attorney (Khan) had entered into a contingency fee arrangement, essentially buying a stake in a civil rights lawsuit she filed on behalf of her client. Eventually, and unbeknownst to Khan, the town president – a defendant in that suit – and others convinced the plaintiff to settle the lawsuit. Khan then sued these defendants, alleging that their actions, undertaken under color of state law, unconstitutionally impaired the contract between her and her client. On appeal, the Seventh Circuit rejected her Contracts Clause claim:

> A State violates the Contracts Clause if a "change in state law has 'operated as a substantial impairment of a contractual relationship.'" "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." Here the first component is met because Khan and Serfecz had a contract, but the second component is not met. The defendants' allegedly wrongful acts that induced Serfecz to terminate his contract with Khan were not a "change in law," even though the defendants were state actors. It has long been settled that the language of the Contracts Clause- pass any law-prohibits only legislative changes that impair contracts. Khan argues that there was a legislative change here because the Elk Grove board approved the settlement of the condemnation proceeding. We reject that argument. Khan has alleged that the defendants acted tortiously, possibly unconstitutionally, and Elk Grove approved the result of their wrongful acts. But she has not alleged that a legislature "pass[ed]" an unconstitutional law.

*Khan v. Gallitano,* 180 F.3d at 832 (citations omitted).

4

The same analysis applies here. Krans alleges that Hedmark and Newingham's actions essentially convinced Residual Management, Inc., to stop moving foundry sand to the site. But their actions do not constitute a "change in law." *Id.* Krans was before the board on his own request for a vote to approve Phase III of his project, and the board rebuffed him. (As discussed below, there is no evidence that the board's actions had any binding legal impact at all.) In other words, Hedmark and Newingham did not pass any law that impaired a contract – they simply refused to grant Krans' request for approval. Accordingly, the impairment of contracts claim fails as a matter of law.

**B. Equal Protection and Substantive Due Process**

Krans also argues that the Defendants had no scientific or rational basis for opposing his project and asserts that their reasons for denying his request were purely partisan and personal. Because their actions were not linked to any rational purpose, he asserts, they violated the Equal Protection Clause as well as Krans' substantive due process rights.

The constitutional doctrines of substantive due process and equal protection protect individuals from arbitrary government behavior. "The paradigmatic [equal protection] 'class of one' case . . . is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen." *Lauth v. McCollum,* 424 F.3d 631, 633 (7th Cir. 2005). Similarly, a "property owner challenging a land-use regulation as a violation of due process is therefore obliged to show that the regulation is arbitrary and unreasonable, bearing no substantial relationship to public health, safety, or welfare." *General Auto Service Station v. City of Chicago,* 526 F.3d 991, 1000-01 (7th Cir. 2008).

5

Krans' claims are difficult to understand, chiefly because there is no evidence the Defendants' actions had any practical effect on Krans' foundry sand project. On the one hand, Krans now alleges that the Defendants' irrational vote effectively thwarted his ability to complete his fill project, but on the other hand he alleged earlier in this lawsuit (including in his own recent deposition) that the board's approval was never even required in the first place. If the board's vote was truly unnecessary, the Defendants' vote against his project could no more have violated Krans' rights than any other expression of opinion or whimsy uttered by a government actor.

The first inkling of this problem occurred at the August 2006 board meeting itself. Krans opened the meeting by suggesting that he was asking for the board's approval, and he later asked for a vote, yet throughout the meeting he continued to assert that the entire project had already been approved and that the board's approval was unnecessary. In his deposition, two years later, Krans explained that at the fateful board meeting he was not presenting the board with a specific request for approval but merely presenting "information" to the board. Given the negative publicity about his project circulating around town, he testified that he simply wanted to appear in person, present information, and get the town "off my back." (Dkt. # 61, Ex. B at 81.) Apparently someone from the town had contacted state DNR officials and people at the county zoning committee, and Krans believed "it was the town going to the zoning and creating all the havoc that happened. That was the same thing that happened with the DNR; the town constantly calling – the town principal constantly calling the DNR and constantly calling zoning." (*Id.*) Thus, apparently Krans thought if he simply informed the town of his plans it might ameliorate the public relations aspect of his project. But he remained adamant that the board's approval was not required:

6

> Q Okay. But just so I'm clear, you – there was really no request on the table that you were making of the board?
>
> A No; no; no.
>
> . . .
>
> Q Well, what did you want them to vote on?
>
> A I didn't want them to vote.

(*Id.* at 87-88.)

Given Krans' belief that the town's approval was not required for his project to go forward, as well as the fact that he never attempted to proceed through the county zoning committee or the DNR, his claim that the Defendants' vote somehow thwarted his project is downright puzzling. The Defendants argue persuasively that their vote (made at Krans' request) was merely an expression of a lack of support for Krans' project. They would not give their stamp of "approval" to the project, but neither did they have the power to grant or deny a permit for the use of foundry sand. As such, their vote was at best advisory and at worst meaningless. Either way, it did not deprive Krans of any of his constitutional rights.

The Defendants have provided an affidavit of the Florence County Zoning Administrator, Rich Wolosyn, who states that "regardless of whether the Town of Aurora Board would have voted to allow Thomas Krans to use additional foundry sand at the site, without a new or modified conditional use permit from Florence County the use of such additional sand would be in violation of the original conditional use permit issued by Florence County." (Wolosyn Aff., ¶ 17.) If Krans wanted to proceed with a Phase III involving more foundry sand, "it would be necessary for him to reapply for either a new conditional use permit or an amended conditional use permit with the

7

Florence County Planning and Zoning Committee." (*Id.,* ¶ 16.) Although the town board's concerns would be taken into consideration by the county zoning committee, the decision was left to the sole discretion of the county. (*Id.*, ¶¶ 20, 21.) Krans never applied with the County for an additional permit.

Krans himself testified that the board's vote was not required, and the county's zoning administrator testified that it was the County – rather than the town board – that had the exclusive power to issue the required fill permit. Even if the town board had some kind of advisory role to play with the County Zoning Committee, Krans never availed himself of that avenue, likely because he disputes the county's position that he would need a new permit. Krans concedes that he never sought a permit from the County, and he presents no evidence that the Defendants' actions had any adverse impact on his ability to use foundry sand in Phase III of his project. Instead, Krans merely attacks the votes of Hedmark and Newingham as being based on irrational, unscientific considerations. But mere votes, in themselves, do not give rise substantive due process or Equal Protection Clause concerns, or else courts would be crammed with plaintiffs complaining that their elected officials were acting irrationally. Instead, for purposes of either equal protection or due process the defendant's conduct must actually injure the plaintiff in some tangible way. A merely symbolic vote with no discernable practical effect cannot have violated Krans' constitutional rights, especially since he never even pursued his project before the county committee. Nor can Krans show he had some sort of protectible interest in garnering the Defendants' support. Words alone can form the basis of other claims – such as Krans' state law defamation claims – but Krans has conceded that the vote of the town board had no impact whatsoever on his project, and Krans never

8

sought the approval of the county for his project.[2] Accordingly, summary judgment will be granted in the Defendants' favor on these claims as well.

**C. State Law Claims**

The Defendants urge the Court to consider the pendant state law claims even if the federal claims are dismissed. That, however, would fly in the face of usual practice. Under 28 U.S.C. § 1367(c), district courts may decline to exercise supplemental jurisdiction over state law claims once all the federal claims have dropped out. The Seventh Circuit has described a "sensible presumption that if the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims. Substantial judicial and party resources will probably not have been expended on the litigation, and so the economies from retaining jurisdiction over the state-law claims will be slight." *Williams Electronics Games, Inc. v. Garrity,* 479 F.3d 904, 907 (7th Cir. 2007) (citation omitted). Although this court has the discretion to retain jurisdiction – for example, in the event substantial consideration of the state law issues had already been undertaken – the parties offer nothing more persuasive than their own preference that the court consider these claims. That is not enough. In fact, when the remaining claims involve contentious, local, and essentially political issues, it seems prudent for a remote federal tribunal to be especially reluctant to continue its involvement in the case absent other compelling considerations. Accordingly, the state law claims will be dismissed without prejudice.

---

[2]Krans contests Wolosyn's interpretations as to the scope of the original permit he had obtained from Florence County. (Dkt. # 67, ¶¶ 2, 3.) But this dispute is an issue Krans has with the County – not the town board – and does not support the notion that the town board's vote caused Krans any actual injury. In fact, he still maintains that a permit from the county was not even required for Phase III, and so it is puzzling why he believes the town board would have played a meaningful role in the process.

9

**III. Conclusion**

For the reasons given above, the Defendants' motion for summary judgment is **GRANTED** in part, and all federal claims are **DISMISSED**. All remaining claims are dismissed without prejudice.

**SO ORDERED** this ___4th___ day of November, 2008.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge